# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

    **v.**                            **Case No. 23-CR-155**

**KEENAN J. DENRUYTER,**

    **Defendant.**

---

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO DISMISS

---

On August 22, 2023, a grand jury sitting in the Eastern District of Wisconsin returned a five-count indictment against Keenan J. Denruyter. (Docket # 1.) Denruyter was charged in Counts One and Two with distribution of fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Denruyter was charged in Count Three with possession of fentanyl and cocaine with the intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). Denruyter was charged in Count Four with possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A)(i). Finally, Denruyter was charged in Count Five with possession of a firearm and ammunition by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). Denruyter was arraigned on the charges and entered a plea of not guilty. (Docket # 3.) On October 3, 2023, a grand jury returned a superseding indictment against Denruyter. (Docket # 11.) The original five counts remain, with the addition of a count charging Denruyter with distribution of fentanyl resulting in death, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). (Superseding Indictment, Count Three.) The felon-in-possession charge was renumbered as Count Six in the superseding indictment.

(*Id.*, Count Six.) Denruyter was arraigned on the charges and entered a plea of not guilty. (Docket # 12.) Jury trial is scheduled before the Honorable William C. Griesbach on January 29, 2024. (*Id.*)

Prior to the return of the superseding indictment, Denruyter moved to dismiss the charge of felon-in-possession of a firearm (Count Five of the indictment and Count Six of the superseding indictment) on the grounds that § 922(g)(1) is unconstitutional as applied to the facts of his case. (Docket # 7.) The government responded in opposition to the motion. (Docket # 8.) Although the parties were given new dates to file additional motions, as the felon-in-possession count remains in the superseding indictment, I will address the motion as briefed. For the reasons explained below, I recommend that Denruyter's motion to dismiss be denied.

## BACKGROUND

Denruyter has two prior felony convictions. Specifically, in Brown County Case No. 16-CF-1432, Denruyter entered a no-contest plea to possession with intent to distribute cocaine in violation of Wis. Stat. § 961.41(1m)(cm)1r. (Docket # 7 at 2.) In Brown County Case No. 19-CF-1385, Denruyter entered a no-contest plea to vehicle operator flee/elude officers in violation of Wis. Stat. § 346.04(3). (*Id.*) The government alleges that on July 17, 2023, Denruyter knowingly possessed a firearm and ammunition, despite knowing that he has two felony convictions. (Superseding Indictment, Count Six.)

## ANALYSIS

Denruyter challenges the constitutionality of 18 U.S.C. § 922(g)(1) under which he is charged in Count Six of the superseding indictment. Pursuant to Fed. R. Crim P. 12(b)(1), a party may raise by pretrial motion any defense, objection, or request that the court can

determine without a trial on the merits. Furthermore, a defendant can move before trial to dismiss an indictment for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(B). A defendant can make such a motion on the basis that the charged offense is based on an unconstitutional statute. *United States v. Posey*, No. 2:22-CR-83 JD, 2023 WL 1869095, at *1 (N.D. Ind. Feb. 9, 2023). A constitutional challenge to a statute can be brought either as a facial challenge, or an as-applied challenge.

In this case, Denruyter argues that § 922(g)(1) is unconstitutional as applied to him. (Docket # 7 at 1.) An as-applied challenge "is one that charges an act is unconstitutional as applied to a plaintiff's specific activities even though it may be capable of valid application to others." *Surita v. Hyde*, 665 F.3d 860, 875 (7th Cir. 2011). Thus, when presented with an as-applied challenge, the Court examines only the facts of the case before it and not any set of hypothetical facts under which the statute might be unconstitutional. *United States v. Phillips*, 645 F.3d 859, 863 (7th Cir. 2011).

Denruyter challenges the constitutionality of the felon-in-possession statute based on the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). *Bruen* addressed the constitutionality of a New York licensing regime where the government conditioned issuance of a license to carry a handgun on a citizen's showing of a special need for self-defense. 142 S. Ct. at 2122. In finding the New York law unconstitutional, the *Bruen* Court articulated an analytical framework for determining whether a firearm regulation is constitutional:

> In keeping with [*Dist. of Columbia v.*] *Heller*, [554 U.S. 570 (2008)] we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if

3

a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10, 81 S. Ct. 997, 6 L.Ed.2d 105 (1961).

*Id.* at 2126. Since *Bruen*, courts have been inundated with litigation challenging the constitutionality of firearm regulation statutes, particularly § 922(g), which consists of nine categories of individuals who are prohibited from possessing firearms and ammunition. Once again, Denruyter is charged under § 922(g)(1), which prohibits those who have been convicted of a felony from possessing firearms and ammunition. Utilizing *Bruen*'s two-step analysis, the government argues that § 922(g)(1) passes constitutional muster under *Bruen*. First, the government argues that the Second Amendment's plain text does not cover the rights of felons to possess firearms; thus, the Constitution does not presumptively protect Denruyter's conduct of possessing a firearm and ammunition. (Gov't Resp. Br. at 12–18, Docket # 8.) Second, the government argues that even if the Second Amendment covers possession of firearms by felons, § 922(g)(1) is consistent with the United States' historical tradition of firearm regulation. (*Id.* at 19–35.)

The Seventh Circuit has yet to resolve the issue of § 922(g)(1)'s constitutionality post-*Bruen*; however, both the Third and the Eighth Circuits have addressed the issue (and reached opposite conclusions), as well as nearly two hundred district courts across the country. (*See* Gov't Resp. Br., Ex. A, Docket # 8-1.) Although none of this authority is binding on this Court, I am guided by the Third and Eighth Circuits' analyses and will address each argument in turn.

1.      *Plain Text of the Second Amendment*

The *Bruen* Court instructs that in considering the constitutionality of a law regulating firearm possession, I must first consider whether the Second Amendment's plain text covers

4

an individual's conduct. 142 S. Ct. at 2126. The Second Amendment provides that: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The crux of the government's argument is that felons do not fall within "the people" protected by the Second Amendment; thus, a felon's right to keep and bear arms is not infringed by a law prohibiting his or her possession of them. (Gov.'t Resp. Br. at 12–18.) The government argues that "the people" referenced in the Second Amendment means law-abiding, responsible citizens. (*Id.* at 16.)

The Third Circuit's recent decision in *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023) is particularly persuasive on this issue. In *Range*, the court considered whether Range, a previously convicted felon, was one of "the people" who have Second Amendment rights. *Id.* at 101. As here, the government in *Range* argued that pursuant to *Heller*, the Second Amendment does not apply to Range because the right to bear arms is limited to the political community of law-abiding, responsible citizens. *Id.* Thus, "Range's 1995 conviction, the Government insists, removed him from 'the people' protected by the Second Amendment." *Id.* The *Range* court rejected the government's argument for four reasons.

First, the court found that the criminal histories of the plaintiffs in cases such as *Heller*, *Bruen*, and *McDonald v. City of Chicago*, 561 U.S. 742 (2010) were not at issue; thus, any references to "law-abiding, responsible citizens" by the Supreme Court were *dicta* and should not be overread. *Id.* I agree. In the present case, the government also relies heavily on the *dicta* from *Bruen* and *D.C. v. Heller*, 554 U.S. 570 (2008) in support of its argument. It argues that the *Heller* Court stated that the Second Amendment's purpose is to protect the rights of "law-abiding, responsible citizens to use arms in defense of hearth and home" (Gov't Resp. Br. at

5

15, citing *Heller*, 554 U.S. at 635) and that the *Bruen* Court similarly characterized the holders of Second Amendment rights as "law-abiding" citizens, repeating the phrase no less than fourteen times in the decision (*id.* at 14–15).

But neither the *Bruen* nor the *Heller* Courts attempted to define the term "the people" in either decision. And to the extent the Supreme Court does define "the people" in regard to the Second Amendment, it does not support the government's reading. For example in *Heller*, the Court cites to its earlier decision in *Verdugo-Urquidez*, noting that in the provisions of the constitution referring to individual rights, such as the Fourth Amendment, the term "the people" "unambiguously refers to all members of the political community, not an unspecified subset." 554 U.S. at 580. The *Heller* Court thus started its Second Amendment analysis with "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581.

The *Range* court's analysis is also consistent with the Seventh Circuit's decision in *United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015), where it was careful not to rely too heavily on *Heller*'s statement regarding "law-abiding citizens." *Id.* at 669. The court stated that while "some of *Heller*'s language does link Second Amendment rights with the notions of 'law-abiding citizens' and 'members of the political community,' those passages did not reflect an attempt to define the term 'people.' We are reluctant to place more weight on these passing references than the Court itself did." *Id.*

Second, the *Range* court found that other Constitutional provisions, such as the Fourth Amendment, references "the people" as well, and unless "the meaning of the phrase 'the people' varies from provision to provision—and the Supreme Court in *Heller* suggested it does not—to conclude that Range is not among 'the people' for Second Amendment purposes

would exclude him from those rights as well." 69 F.4th at 102. Once again, I agree. The Constitution does not define who belongs to "the people." The Constitution's preamble begins with the following language: "We the People of the United States." The first ten amendments to the Constitution, known as the Bill of Rights, follows the preamble. In five of these ten amendments, specifically the First, Second, Fourth, Ninth, and Tenth Amendments, the text refers to the rights of "the people." In *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), the Supreme Court stated that:

> "[T]he people" protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.

*Id.* at 265. There is no indication, either from the plain language of the constitution or from the Supreme Court, to adopt inconsistent readings of "the people" within the Bill of Rights. And one would be hard-pressed to argue that those with felony convictions are no longer, for example, protected by the Fourth Amendment.

Third, the *Range* court noted that simply because one has rights under the Second Amendment does not mean that the rights cannot be constitutionally limited. 69 F.4th at 102. In this case, the government argues that committing a felony often results in the forfeiture of a number of rights tied to membership in the political community, such as serving on a federal jury or deprivation of the right to hold office. (Gov't Resp. Br. at 13.) But, as the *Range* court noted, whether a right may be stripped from an individual is a different inquiry than whether the individual holds the right in the first place. *See, e.g.*, *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting) ("It is one thing to say that certain weapons or activities fall outside the scope of the right . . . It is another thing to say that certain people fall outside the

7

Amendment's scope."). I am unconvinced that a felony conviction removes someone from inclusion in "the people."

Fourth, the *Range* court found the phrase "law-abiding, responsible citizens" to be "as expansive as it is vague." 69 F.4th at 102. The court stated:

> We are confident that the Supreme Court's references to "law-abiding, responsible citizens" do not mean that every American who gets a traffic ticket is no longer among "the people" protected by the Second Amendment. Perhaps, then, the category refers only to those who commit "real crimes" like felonies or felony-equivalents? At English common law, felonies were so serious they were punishable by estate forfeiture and even death. 4 William Blackstone, Commentaries on the Laws of England 54 (1769). But today, felonies include a wide swath of crimes, some of which seem minor. And some misdemeanors seem serious. As the Supreme Court noted recently: "a felon is not always more dangerous than a misdemeanant." *Lange v. California*, ⸺ U.S. ⸺, 141 S. Ct. 2011, 2020, 210 L.Ed.2d 486 (2021) (cleaned up). As for the modifier "responsible," it serves only to undermine the Government's argument because it renders the category hopelessly vague. In our Republic of over 330 million people, Americans have widely divergent ideas about what is required for one to be considered a "responsible" citizen.

*Id.* The *Range* court further found that to limit the Second Amendment to only "law-abiding, responsible citizens" would give legislators the authority to decide whom to exclude from "the people." *Id.* at 102–03. The *Range* court rejected an approach giving legislators such unfettered authority. *Id.* Again, the Supreme Court did not define "the people" in *Heller*, much less attempt to define "law-abiding" and "responsible" within that context. There is no authority to suggest that those convicted of a felony no longer belong to "the people" as referred to in the Second Amendment.

For these reasons, I reject the government's argument that Denruyter is no longer one of "the people" under the Second Amendment due to his felony conviction. As § 922(g)(1) regulates Second Amendment conduct, I find that the Second Amendment's plain text covers

Denruyter's conduct of possessing firearms and ammunition and thus the Constitution presumptively protects the conduct.

      2.        *Whether § 922(g)(1) is Consistent with the Nation's Tradition of Firearm Regulation*

Because Denruyter and his conduct are protected by the Second Amendment, I must consider whether the government can strip him of his right to keep and bear arms. Under *Bruen*, I must determine whether the government has demonstrated that § 922(g)(1) is consistent with this Nation's historical tradition of firearm regulation. 142 S. Ct. at 2126. The *Bruen* Court instructed:

> To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond v. Robinson*, 9 F.4th 217, 226 (CA3 2021). On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

142 S. Ct. at 2133. Denruyter argues that the government cannot meet its burden because in the early American republic, there were no laws that prohibited non-violent felons from possessing firearms after they had completed their punishment. (Def. Reply Br. at 6, Docket # 10.) The government, however, focuses its analysis primarily on the history of dispossessing those considered *untrustworthy* of their firearms (Gov't Resp. Br. at 19–41) rather than those considered "dangerous" (*id.* at 41–42). The government begins with English legal tradition dating back to 1689 of disarming groups considered by the government to be untrustworthy, for example, disarming Catholics who refused to make declarations renouncing their faith. (Gov't Resp. Br. at 20–21.) The government contends that this prohibition on firearms was not based on a concern that Catholics were dangerous but based on a concern with Catholics'

propensity to disobey the sovereign. (*Id.* at 21.) The government cites to other English laws disarming those considered disobedient to the King, such as Quakers, despite the fact that they were pacifists. (*Id.* at 22–23.)

The government then turns to Colonial America, citing examples of firearm regulations directed toward disarming classes of people considered "[un]dependable adherents to the rule of law," such as Native Americans. (*Id.* at 23–24.) The government further cites examples of colonies disarming free, Christian, white men—individuals otherwise considered full-fledged members of the political community—whom authorities believed could not be trusted to obey the law. (*Id.* at 24–25.) The government argues that throughout the Revolutionary War, numerous disarmament laws were passed targeting those who failed to demonstrate loyalty to the emerging American government. (*Id.* at 25–27.) Again, these laws included those considered pacifists, such as Quakers and Mennonites. (*Id.* at 27.) The government cites specifically to a Pennsylvania law having the effect of depriving a sizable number of pacifists of the right to bear arms because oath-taking violated their religious convictions, despite Pennsylvania being one of the first states to adopt a state constitutional provision protecting an individual right to bear arms. (*Id.*)

The government next cites the ratification debates behind the Second Amendment's adoption as evidence that the founders understood the individual right to bear arms was compatible with broad legislative authority to disarm groups who could not be trusted to follow the law. (*Id.* at 27–30.) The government further argues that historically, felonies were considered the most serious categories of crimes, often punishable by total forfeiture of land or death. (*Id.* at 30–34.) It argues that this indicates that "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be

10

within the scope of those entitled to possess arms." (*Id.* at 33, quoting *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019).)

The *Range* court was presented many of the same arguments the government presents here but concluded that the government failed to meet its burden of demonstrating that disarming felons is consistent with this Nation's tradition of firearms regulation. While specifically noting that its decision did not turn on a distinction between dangerous and non-dangerous felons, *see* 69 F.4th at 104 n.9, the *Range* court found that other status-based restrictions used to disarm certain groups based on race or religion were not sufficiently analogous, *id.* at 105. "That Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today. And any such analogy would be 'far too broad[ ].'" *Id.* (internal citation omitted). Nor was the *Range* court convinced by the government's argument that founding-era felons faced much harsher consequences than disarmament (such as death) stating "[t]hat Founding-era governments punished some nonviolent crimes with death does not suggest that the particular (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition." *Id.*

Interestingly, the Eighth Circuit in *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023), considering much of the same historical evidence, concluded that there was "considerable support in the historical record" for the "authority of Congress to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society." *Id.* at 504. In *Jackson*, the defendant, like Denruyter, was previously convicted of "non-violent" drug offenses. *Id.* at 501. The *Jackson* court concluded, however, that history "shows that the right to keep and bear arms was subject to restrictions that included prohibitions on possession by

certain groups of people." *Id.* at 502. The *Jackson* court looked to the restrictions on possession of firearms in the late 1600s in England when the government disarmed non-Anglican Protestants who refused to participate in the Church of England and Catholics who refused to denounce their faith. *Id.* The *Jackson* court considered the laws in colonial America prohibiting Native Americans and Catholics from owning firearms and during the Revolutionary War prohibiting the possession of firearms by people who refused to declare an oath of loyalty. *Id.* at 502–03.

The *Jackson* court also concluded that even if the historical regulation of firearms possession was viewed as an effort to address a risk of dangerousness, then the prohibition on possession by convicted felons still passed muster under historical analysis. *Id.* at 504. The court found that "if dangerousness is considered the traditional *sine qua non* for dispossession, then history demonstrates that there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons. Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed." *Id.* Thus, the *Jackson* court concluded that:

> Whether those actions are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons. Consistent with the Supreme Court's assurances that recent decisions on the Second Amendment cast no doubt on the constitutionality of laws prohibiting the possession of firearms by felons, we conclude that the statute is constitutional as applied to Jackson.

*Id.* at 505–06. Denruyter does not challenge the accuracy of any of the historical evidence the government presents. (*See* Def.'s Reply Br.) Rather, Denruyter argues that the government has failed to show a robust tradition of "distinctly similar" regulations as of 1791 specifically

12

restricting *felons* from gun ownership. (*Id.* at 6–7.) In other words, Denruyter urges this Court to follow the *Range* court's analysis over the *Jackson* court's analysis.

While Denruyter is correct that the government does not cite to specific historical laws disarming felons, the *Bruen* Court requires the government identify a well-established and representative historical analogue, not a historical twin. 142 S. Ct. at 2133. I agree with the *Jackson* court's reasoning that the Nation's early laws restricting those considered by the government to be untrustworthy are "analogous enough to pass constitutional muster." *See id.* To be clear, I do not condone those prohibitions based on such categories as race and religion and, as the *Jackson* court recognized, many of these categorical prohibitions would be considered "impermissible today under other constitutional provisions." *Jackson*, 69 F.4th at 503. However, I agree with the *Jackson* court's finding that these prohibitions are relevant in determining the historical understanding of the right to keep and bear arms. *Id.* at 503. And, as the *Jackson* court concluded, these early laws restricting categories of persons considered either untrustworthy or dangerous demonstrates that "Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons." *Id.* at 505–06. For these reasons, I recommend Denruyter's motion to dismiss be denied.

## CONCLUSION

Denruyter moves to dismiss the charge against him for possessing a firearm as a previously convicted felon on the grounds that under the Supreme Court's recent decision in *Bruen*, 18 U.S.C. § 922(g)(1) fails to pass constitutional muster. While I agree that Denruyter's felony conviction does not remove him from the ambit of "the people" protected by the Second Amendment, I find that the government has demonstrated that § 922(g)(1) is

consistent with this Nation's historical tradition of firearm regulation. For these reasons, I recommend Denruyter's motion to dismiss be denied.

**NOW, THEREFORE, IT IS RECOMMENDED** that Defendant's Motion to Dismiss (Docket # 7) be **DENIED**.

Your attention is directed to General L.R. 72(c), 28 U.S.C. § 636(b)(1)(B) and Federal Rules of Criminal Procedure 59(b), or Federal Rules of Civil Procedure 72(b) if applicable, whereby written objections to any recommendation or order herein, or part thereof, may be filed within fourteen days of the date of service of this recommendation or order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the Court in writing.

Dated at Milwaukee, Wisconsin this 17th day of October, 2023.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge